```
 1

 2                 IN THE UNITED STATES DISTRICT COURT

 3               FOR THE WESTERN DISTRICT OF VIRGINIA

 4                          ABINGDON DIVISION

 5  UNITED STATES OF AMERICA,      )
                                   )
 6               Plaintiff,        )   Criminal Case No.
                                   )   1:19-cr-00016-JPJ-PMS
 7  vs.                            )
                                   )
 8  INDIVIOR INC. (A/k/a Reckitt   )
    Benckiser Pharmaceuticals      )
 9  Inc.) And INDIVIOR PLC,        )
                                   )
10               Defendants.       )
    _____

11

12                 TRANSCRIPT OF MOTION HEARING
                HONORABLE JUDGE JAMES P. JONES PRESIDING
13                  THURSDAY, FEBRUARY 27, 2020
    _____

14

15

                         A P P E A R A N C E S

16

    On behalf of the United States:
17           Albert Pilavin Mayer
             U.S. Department of Justice - Civil Division
18           Ben Franklin Station
             P.O. Box 261
19           Washington, DC 20044

20           Steven Randall Ramseyer
             United States District Attorneys Office - Abingdon
21           180 West Main St., Room B19
             Abingdon, VA  24210

22

             Daniel Bubar
23           United States Attorneys Office
             310 First Street, S.W. Room 906
24           Roanoke, VA 24008

25  Proceedings taken by Certified Court Reporter and transcribed
    using Computer-Aided Transcription
```

```
 1              A P P E A R A N C E S  (Continued)

 2    On behalf of the Defendants:

 3              JAMES LOONAM
               Jones Day
 4              250 Vesey Street
               New York, NY 10281-1047
 5
               Georgina Natasha Druce
 6              Jones Day
               51 Louisiana Avenue, N.W.
 7              Washington, DC 20001

 8              James Russell Wooley
               Jones Day
 9              901 Lakeside Avenue
               Cleveland, OH 44114-1190
10
               Peter John Romatowski
11              Jones Day
               51 Louisiana Avenue, N.W.
12              Washington, DC 20001

13              Thomas Jack Bondurant, Jr.
               Gentry Locke Rakes & Moore
14              P.O. Box 40013
               Roanoke, VA 24022-0013
15
               Jennifer Scott DeGraw
16              Gentry Locke Rakes & Moore
               10 Franklin Road, SE, Suite 900
17              Roanoke, VA 24011

18

19

20

21

22

23

24

25    Proceedings taken by Certified Court Reporter and transcribed
      using Computer-Aided Transcription
```

```
 1        (Proceedings commenced at 1:31 p.m.)

 2            THE COURT:  Good morning, ladies and gentlemen.  The

 3    clerk will call the case.

 4            THE CLERK:  United States v. Indivior and Company,

 5    et al.  Criminal Docket 1:19cr16.

 6            THE COURT:  We're here today for oral argument on

 7    the defendants' motion to dismiss.  And I have read the

 8    briefs.  And I'll be glad to hear argument.

 9            MR. LOONAM:  Good afternoon, Your Honor.  May it

10    please the Court, James Loonam of Jones Day on behalf of

11    Defendants Indivior.

12            The gravamen of any fraud claim is dishonesty.  A

13    material omission, a material misstatement made to a victim to

14    obtain money or property.  That's fraud.

15            In the present case the government is pursuing wire

16    fraud, mail fraud, and health care fraud claims against the

17    defendants all premised on the same purported scheme.  And the

18    allegations contained in the superseding indictment can be

19    divided into two categories, as the government itself does in

20    paragraph 1 of the superseding indictment.

21            And, Your Honor, if you have a copy of the

22    superseding indictment in front of you, it might be useful.

23    If not, I have one for you.

24            THE COURT:  I do.

25            MR. LOONAM:  Yes, Your Honor.
```

1            So first, paragraphs 16 through 96 of the

2   superseding indictment concern alleged misrepresentations made

3   by the defendants in marketing Suboxone Film to doctors and

4   health care benefit programs; specifically, statements

5   regarding the reduced risk of pediatric exposure and diversion

6   for Suboxone Film.  Now, we will vigorously fight these

7   allegations at trial.  We believe the evidence will show that

8   Suboxone Film was, in fact, effectively designed to reduce the

9   risk of pediatric exposure and diversion.  As an aside,

10  watching a room full of lawyers trying to pry open a package

11  of Suboxone Film was comical.  But that's for trial because

12  those allegations of misrepresentations sound in fraud.

13           But the indictment contains a second set of

14  allegations that does not sound in fraud.  Paragraphs 97

15  through 143 of the superseding indictment alleged that the

16  defendants did, quote, "Aid, abet, counsel, command, induce,

17  and procure," end quote, doctors who they knew were

18  prescribing in a careless and clinically unwarranted manner to

19  switch their prescriptions to Suboxone Film.

20           And that's paragraph 97, Your Honor, I would focus

21  you on, which is the introductory paragraph to the careless

22  prescriber allegations.  So these allegations --

23           THE COURT:  Why can't a conspiracy have different

24  objects?

25           MR. LOONAM:  Well, a conspiracy can have different

```
 1    objects.  But if it's fraud conspiracy, the conspiracy, the
 2    fraud claims need to be premised in dishonesty, in fraud
 3    claims.  You need to conspire to commit fraud.
 4              THE COURT:  Right.
 5              MR. LOONAM:  Now, if this was a Title 21 case and
 6    there was a conspiracy, perhaps the prescribing practices of
 7    the doctors would be relevant here.  That's not what's
 8    alleged.  What's alleged is a conspiracy to commit health care
 9    fraud, wire fraud, and mail fraud.  And so the objects and the
10    means for those conspiracies have to be means to commit wire
11    fraud, mail fraud, and health care fraud as alleged.  And when
12    you look at what the indictment states, and I think what's
13    telling here is if you go to, and I'll skip ahead to
14    paragraph 31 here, Your Honor, paragraph 31 is the paragraph
15    that lays out the scheme and artifice to defraud.  Right?
16              So it says, "Between in or about 2006 and the date
17    of this indictment, the defendants, and their executives,
18    employees, and agents did devise and intend to devise a scheme
19    and artifice to defraud and to obtain money and property from
20    health care benefit programs by means -- here's laying out the
21    means -- "of materially false and fraudulent pretenses,
22    representations, and promises by..."  And then it specifies
23    the means.  All right?
24              "A.  Making materially false and fraudulent --
25              THE COURT:  I have it in front of me.
```

1            MR. LOONAM:  Sure, Your Honor.

2            But if you look at A, B, and C, right? A, B, and C

3     all set forth making materially false and fraudulent

4     statements.  Right?  That's sounds in fraud.  Undoubtedly

5     sounds in fraud.  Right?  It's a material statement that's

6     alleged to be misleading to obtain money or property.

7            But when you get to D, and that's the focus of our

8     motion, D is the focus of our motion.  And the way this is set

9     up, A, B, C, D, that relates to subsections in the indictment.

10    So A corresponds to the subsection in the indictment, and B,

11    C, D, so forth.  The allegations for D are paragraphs 96

12    through -- or 97 through 143.  There's no allegation here of a

13    materially false or fraudulent statement.  It's, "Marketing

14    Suboxone to health care providers to be prescribed and

15    dispensed in a careless and clinically unwarranted manner."

16            All right.  So is there some dishonesty there that's

17    not set forth plainly in C?  And we're left guessing.

18            But when you go to paragraph 97 of the indictment,

19    which is where the allegations of D pick up, what they say is

20    that -- and, Your Honor, I have it in front of me, so I won't

21    read the whole thing and try your patience, but the careless

22    prescription is only pled with respect to Indivior's

23    knowledge.  It's not used to perpetrate the fraud.  So it's

24    not as if this is a fraud where the careless prescription

25    practices as in a typical health care fraud scheme, the

```
 1    prescription practices result in false Medicare claims going

 2    out to defraud Medicare.  That's sort of a, you know, bread

 3    and butter health care fraud claim with false statements.

 4    That's not what they say here.  That is not what's pled.

 5           What's pled is that the wild knowings that there

 6    were careless prescription practices at certain doctors,

 7    Indivior used lunches and dinners, it used a patient finder to

 8    induce those doctors to switch to Suboxone Film.  That's what

 9    paragraph 97 says.

10           And the problem with that is is that dinners,

11    lunches, the Here to Help program, none of its dishonest.

12    None of it is.  They don't allege that it's misleading at all.

13    They don't allege that these doctors were duped through the

14    lunches or the Here to Help program to then switch to Suboxone

15    Film.  Right?  That would be fraud if you duped the doctors

16    into switching to Suboxone Film, that's the allegations in A,

17    B, and C.  D is of a different ilk.

18           THE COURT:  Well, are you saying it's like bribery?

19    Is that -- instead of fraud?

20           MR. LOONAM:  No.  I mean -- well, look.  What we

21    have is just what's pled in the indictment.  Right?  So we

22    have to go on the face of the indictment.  But if you're

23    asking me if lunches and dinners with a doctor to get them to

24    use your products -- that's every-day business for a

25    pharmaceutical company.  There's nothing -- there's nothing
```

1    unusual about that.

2          THE COURT:  Well, that doesn't mean -- I mean,

3    politicians engage in every-day practices which I think most

4    of us might consider bribery.  But, in any event.

5          MR. LOONAM:  Well, Your Honor, look, if there was an

6    anti-kickback statute claim, they didn't bring it.  All right.

7    If there was a bribery claim, they didn't bring it.

8          THE COURT:  I understand your point.  I was just

9    trying to see what you would characterize that as.  It's not

10   fraud you say.

11         MR. LOONAM:  It's not fraud.

12         THE COURT:  You say it's nothing.  You say it's just

13   good business practice they've charged.

14         MR. LOONAM:  Maybe.  If there's something nefarious

15   about it, it hasn't been pled.  That's where we are.

16         The idea of taking doctors to lunch and dinner I

17   believe is accepted practice.  In fact, I believe courts have

18   looked at this and I believe there are regulations that cover

19   the ability of pharmaceutical reps to take doctors to, you

20   know, reasonable lunches and dinners.

21         THE COURT:  Well, I think so.  I mean, the doctor I

22   go to, when I go to his office, a pharmaceutical rep is

23   bringing in lunch for all the staff.

24         MR. LOONAM:  So, you know, in any event, the core

25   point for purposes of today, for this motion, Your Honor, is

1    that that's not a deceptive practice.  That's not a fraud.

2    They don't -- and it's not alleged as such.  Right?  It's not

3    alleged that the doctors were duped by the lunches, that the

4    doctors were duped by the Here to Help program.

5         You know, the indictment is not a model of clarity

6    with respect to these -- how the government is using these

7    careless prescription practices.  It's articulated a few

8    different ways.  And so in our original motion --

9         THE COURT:  So do you want me to strike D?

10        MR. LOONAM:  Yes.  Yes, D should be stricken,

11   Your Honor.

12        A, B, and C -- and it should be stricken for a

13   couple reasons.  It's inflammatory, prejudicial, and doesn't

14   plead fraud.  And to the extent the government uses an

15   argument in the alternative that, well, it shows you -- and

16   here, I'll quote them so I don't get it wrong.

17        The government argues that, "It serves as evidence

18   of Indivior's intent to defraud because it shows that Indivior

19   prioritized converting prescriptions of Suboxone Film over

20   safe and effective opioid-dependence treatment."

21        Well, Judge, that's nothing more than 404(b) other

22   acts evidence of propensity.  They were willing to deal with

23   these doctors.  And even though they knew, allegedly, they

24   were dealing with careless -- they were careless prescribers,

25   they still, you know, kept them on the Here to Help program;

1    they still gave them lunches; they still dealt with them.

2    That's 404(b) evidence of intent of other bad act evidence and

3    it's a total side show, Your Honor, that's going to lengthen

4    this trial by weeks.  By weeks it will lengthen this trial.

5    Because we're going to need to get into the nitty-gritty of

6    the anti-kickback statute, the interactions with these

7    doctors, their prescription practices.  You've already seen

8    some of this in the Rule 17 over the DEA's interactions with

9    them and their prescription practices having nothing to do

10   with the fraud.  The government's merely alleging this

11   propensity evidence.  Well, if they were willing to deal with

12   those doctors to increase their sales, then they must have

13   been willing to commit fraud.  And that's a straight 404(b)

14   motion.

15          Moreover, what's contained in the indictment is not,

16   is not pled as evidence of intent.  So to the extent the

17   government says, well, in the alternative, Your Honor, you

18   should keep this in because it's really evidence of intent,

19   it's not.  It's pled as a means.  It's not pled as intent.  So

20   the government can't pivot and rescue its allegations in

21   trying to retask them by something that wasn't put before the

22   grand jury.

23          To the extent the government argues that this a

24   motion for summary judgment and that it's a matter of evidence

25   and sufficiency of the evidence, it's not.  The indictment

1    says what it says.  And the indictment does not allege that

2    the prescription, the careless prescription practices

3    constituted a misrepresentation, dishonest conduct in any way.

4    Simply doesn't do it.

5         This seems like -- what it does in effect is it

6    significantly prejudices the defendant by essentially trying

7    to dirty them up and tie them to alleged pill-mill doctors.

8    In order to overcome that, it's going to be a monumental

9    effort and, at the end of the day, doesn't even allege fraud.

10   So, yes, Your Honor, we think --

11        THE COURT:  Well, what about the, not pill mill, but

12   doctors who dispense and, you know, bill for it to health care

13   companies, or the government, why would that not be part of

14   the scheme that they're helping these doctors do criminal

15   acts?

16        MR. LOONAM:  Two answers to that.  So the first is,

17   Your Honor, as we were racking our brains groping for what the

18   charges could be here and how this could fit within the

19   scheme, we said, well, perhaps that's what the government's

20   getting at, despite the language of paragraph 97 that said

21   that the aiding and abetting of the careless prescription

22   practices was to switch the doctors to Suboxone Film.  That's

23   the allegation, not to aid and abet them in the fraud to --

24   with -- so we made that.  We said, well, they don't actually

25   allege that, they don't allege that the doctors submitted

1  anything to Medicare or Medicaid or any insurance carrier that

2  was false or fictitious.  They don't allege that any of these

3  referrals that the patients who were referred, that the

4  doctors billed, claimed that prescriptions were medically

5  necessary that, in fact, were not medically necessary.  Could

6  that be a cognizable theory of fraud?  Yes, of course, that

7  could be a cognizable theory of fraud.  That's a bread and

8  butter health care fraud.  They just don't allege that here.

9  And if they had, Your Honor, with respect to the doctors here,

10 it would be a separate scheme.  It would be a separate scheme

11 than the scheme alleged in A through C.  So A through C,

12 right? is that the doctors were duped by misrepresenting the

13 nature of Suboxone Film.  And Suboxone Film was superior to

14 tablet because it would reduce the risk of pediatric exposure

15 and diversion.  Right?  And so in this instance the doctors

16 are victims.

17       With respect to the hypothetical charge that

18 Your Honor just cobbled together with respect to false claims

19 to Medicare, in that instance the doctors are coconspirators;

20 right?  Not victims.  They're not duped.  They're in cahoots

21 with one another and defrauding Medicare.  You have different

22 people responsible, different time periods.  And, so, what you

23 wind up with is two separate schemes put before the jury,

24 wound together in one count, then you wind up with no

25 guarantee of having a unanimous verdict with respect to either

```
 1      one.  Right?  So you have a complete due process problem with
 2      duplicity where half the jurors could believe that there would
 3      have been finding -- they could want to convict on the scheme
 4      Your Honor just thought of and half could want to convict on
 5      the A through C charge by the government about
 6      misrepresentations, and you have a non-unanimous verdict and
 7      we've gone through all this trouble and the count is no good.
 8               And so, Your Honor, that's --
 9               THE COURT:  I mean, it's not -- you say on one side
10      they're victims, on the other side they're coconspirators.
11      But the scheme is to defraud health care benefit programs.
12               MR. LOONAM:  And doctors and health care providers.
13      That's alleged throughout here.  And the way that the health
14      care providers are -- so that's C, Your Honor.  If you go to
15      C.
16               THE COURT:  Well, I'm looking at paragraph 31.
17               MR. LOONAM:  Okay.  And then so paragraph 31 is the
18      introduction --
19               THE COURT:  That's they devised a scheme to defraud
20      and to obtain money from health care benefit programs --
21               MR. LOONAM:  Mm-hmm.
22               THE COURT:  -- "by --
23               MR. LOONAM:  So then go to 78.  That's C,
24      Your Honor.  That lays out in more detail what that means.  So
25      paragraph 78.  So from 2006 to the date of the indictment,
```

made statements and representations that Indivior was

discontinuing distribution of Suboxone Film (sic) due to

safety, when, in fact, it was discontinuing the tablet to

delay the FDA's approval of generic tablet.  And it goes on

about what that means with respect to -- and that's here.  The

Medicaid, you know, administrators and others.  That's what is

set forth in the structure of this indictment.

There's nothing with respect to Drs. A though D or

the careless prescription practices that are spelled out in

this indictment that those individuals defrauded health

benefit programs.

Your Honor, again, we're groping in the dark to try

and figure out what was charged here.  We said, that's not

properly pled in this indictment.  They don't allege that, you

know, the doctors defrauded Medicare.  They didn't make any

allegations about -- and what the government came back with

was that's a straw man.  We're not alleging that.  That's a

straw man.  We're not alleging that you aided and abetted

other crimes of these doctors.  That's a straw man.  What

we've alleged, it's kind of -- if you read the reply, it's a

little bit of ishkabibble means ishkabibble because, it says,

"We've alleged the scheme we've alleged."

THE COURT:  Well, I think the government says this

charge reflects Indivior's referrals and aid to doctors were a

means of the scheme and artifice to defraud.

```
 1              MR. LOONAM:  Exactly.  "Were a means of the scheme."

 2              But what does that mean?  When they talk about the

 3     scheme -- and again, go to paragraph 97.  When it talks about

 4     the -- so no later than April 9th, 2009, which, by the way,

 5     predates when film hit the market, and on the record during

 6     the bill of particulars argument, the government noted that

 7     the practice of dealing with the careless prescribers and the

 8     Here to Help program, according to the government, predated

 9     the introduction of film and they had the same practice with

10     respect to tablets.

11              "Indivior, its executives, employees, agents, did

12     aid and abet, counsel, command, induce, and procure physicians

13     in various positions throughout the United States who they

14     knew were prescribing buprenorphine-containing drugs to more

15     patients in the allotted time at a daily dose higher than

16     24 milligrams and in a careless and clinically unwarranted

17     manner to switch their prescribing to Suboxone Film."

18              That's the scheme they're alleging.

19              THE COURT:  All right.  And that, as a result, the

20     physicians were overprescribing the medication.

21              MR. LOONAM:  Well, not as a result.  The

22     overprescribing is charged as knowledge.  You were aware of

23     this, and even though you were aware of it, you continued to

24     deal with them because you wanted them to switch to film.  And

25     it's a juxtaposition of the knowledge of the their
```

```
1    overprescribing juxtaposed against --
2            THE COURT:  My point was, I guess, if they're
3    overprescribing, they are defrauding Medicare.
4            MR. LOONAM:  No.
5            THE COURT:  Medicaid.
6            MR. LOONAM:  No.  No, no, no, no.  No.  No.  First
7    of all, that is not alleged in here.  Right?  That is not
8    alleged in here.  And the fact that somebody is over their
9    DATA 2000 cap is not defrauding Medicare.  That's not the law.
10   That's not what's pled.
11           We're struck with what their -- the fact that we're
12   here two months before trial and it's unclear as to what the
13   scheme is, even though the government had a chance to reply,
14   and Your Honor read that portion that should crystallize what
15   the scheme is, you know, demonstrates that there's a serious
16   problem I think with this indictment.
17           THE COURT:  The government criticizes the defendants
18   for piecemealing these motions to dismiss, that you could have
19   done this from the beginning and you're overwhelming them.
20           MR. LOONAM:  Your Honor, I mean, so we've answered
21   this in our papers multiple times now.  The government tried
22   to get an order to show cause on this, you know, that
23   Your Honor rightfully rejected.  The idea that we've
24   sandbagged the government by filing this motion five months in
25   advance of trial is completely without merit.  You know, look,
```

 1    the government had a hard deadline for its Rule 16

 2    disclosures.  Hard deadline.  Not substantial completion, hard

 3    deadline.  All Rule 16, all Brady, all Giglio by August 9th of

 4    last year.  We're still receiving supplemental productions as

 5    of a few weeks ago.  We're not running to this court saying

 6    the government sandbagged us.  Of course not.  The government

 7    is acting in good faith.  It's identified additional

 8    information that should have been produced and it's now

 9    producing.  That's the nature of litigation.  In this

10    instance, you know, we had a motion to dismiss pending that

11    took some time for the parties to litigate.  That motion would

12    have mooted all other issues.

13          The government, you know, wound up superseding the

14    indictment to moot it.  And as soon as Your Honor issued a

15    decision on the original motion to dismiss, a month later we

16    filed this motion, five months in advance of trial.  And, so,

17    clearly in the context of Rule 16, the scheduling order is not

18    sacrosanct for the government, nor should it be, because it's

19    just unreasonable.  And we get that.  And it's fine.  But it's

20    not fair for them to say there should be sacrosanct on the

21    other side, especially when it applied to the original

22    indictment.  There was a superseding indictment that the

23    government used to moot our original motion to dismiss.  We

24    noted in all those papers that we anticipated filing an

25    additional motion to dismiss.

```
 1              And, frankly, this indictment, if you look at the
 2    different ways that this theory is articulated, it took a
 3    little time to flush out.  In fact, we tried to flush it out
 4    in the bill of particulars motion to give the opportunity
 5    to crystallize.  And that was denied.  But, during the course
 6    of that, the government made statements that sort of
 7    crystallized their theory here that made it clear that it
 8    doesn't sound in fraud.
 9              And then moreover --
10              THE COURT:  You've convinced me.
11              MR. LOONAM:  Your Honor, yes.
12              THE COURT:  Let's go on to something else here.
13              Your argument, I guess, is connected to your aiding
14    and abetting argument as to the other counts where they add on
15    in the count, you know, Section 2, aiding and abetting.  And
16    there's really no -- I'm confused, like you are, what that
17    means.  Maybe they'll tell us.
18              MR. LOONAM:  So look, Your Honor, to the extent the
19    government wants to charge Indivior under 18, U.S.C.,
20    Section 2 for mail fraud, wire fraud, health care fraud, under
21    A through C, I mean, that's sort of typical government
22    practice.  You know, that's sort of -- that's accomplished by
23    the statutory citation.  The problem here is that they've used
24    the language of 18, U.S.C., Section 2 in the indictment to say
25    that we aided and abetted, then they go on to quote the rest
```

```
 1     of Section 2, the careless prescription practices.  Right?
 2     And all of that to switch those doctors to Suboxone Film.
 3     That is not allowed.  Right?  Because the careless
 4     prescription practices hasn't alleged that the doctors had
 5     committed a primary violation --
 6               THE COURT:  It sounds like, it sounds like in their
 7     response they're really characterizing aiding and abetting.
 8     They say "aid."  They're sort of using a non-legal
 9     characterization of what aiding and abetting is.  They are
10     helping the doctors be careless.
11               MR. LOONAM:  So, Your Honor, that is the term they
12     use.  They don't -- it's not articulated as when we said aid
13     and abet, command, procure, and then quoted 18, U.S.C.,
14     Section 2, what we really meant was colloquially helped.
15               THE COURT:  Right.
16               MR. LOONAM:  Right?  They don't say that.  They
17     don't address the argument at all.  I agree, Your Honor,
18     implicitly what they say --
19               THE COURT:  They charge in its instruction to
20     reflect Indivior's referrals and aid to the doctors.
21               MR. LOONAM:  Yes.  It ignores the fact that they cut
22     and pasted the language from 18, U.S.C., Section 2, which has
23     legal meaning.  Right?  It has legal significance.  Talk about
24     being confusing to a jury when they are going to be instructed
25     by Your Honor on the meaning of Section 2 and all those terms,
```

1    then it's thrown in colloquially, that is not appropriate.

2    Right?  So I think that's subsumed into, you know, if

3    Your Honor strikes the allegations of D because they don't

4    sound in fraud, which there's no basis.  And it's apparent

5    from the face of the indictment you have A through C alleging

6    misstatements and dishonesty to obtain money or property.  And

7    D just says they aided and abetted careless prescription

8    practices to switch to Suboxone Film.  Aiding and abetting

9    careless prescription practices is not fraud.

10          Your Honor's correct, if the government had alleged

11   that, you know, Indivior knew that this doctor would file a

12   claim and assert that this was medically necessary when, in

13   fact, it wasn't.  Indivior referred the patient and had a

14   shared purpose in accomplishing that goal.  Yeah, that sounds

15   like a claim in fraud to me to obtain money or property.  This

16   doesn't do that.

17          THE COURT:  Well, I think I understand your

18   arguments, unless you have a different one.

19          MR. LOONAM:  I think that's all for now, Your Honor.

20          THE COURT:  I'll let you respond.

21          MR. LOONAM:  Otherwise, we'll rely on our papers.

22   Thank you, sir.

23          THE COURT:  All right.  Thank you.

24          MR. MAYER:  Thank you, Your Honor.  Albert Mayer on

25   behalf of the government.

```
 1            THE COURT:  So explain what marketing Suboxone Film

 2   to health care providers to be prescribed and dispensed in a

 3   careless and clinically unwarranted manner, how is that a

 4   fraud means?

 5            MR. MAYER:  Yes, Your Honor.

 6            So to just take a step back in the facts.  Indivior

 7   determined that certain doctors were issuing clinically

 8   unwarranted prescriptions for Suboxone, an opioid.  And the

 9   clinically unwarranted language is the exact language that

10   their medical people use and that went to their medical

11   director.  So they determined that.  They identified the

12   doctors.  And there were other information they had about

13   those doctors.  Like the ones we used, Dr. A had 800 people on

14   Suboxone at one time.  And Dr. C had a Vegas-style cash

15   machine in his office.  Dr. D had something like 70 percent of

16   the patients on unusual high doses.  So they had that

17   information and make the conclusion these people are issuing

18   clinically unwarranted prescriptions.

19            At the same time, the company has something called

20   the Here to Help service which connects patients, ostensibly

21   connects them to doctors for opioid-dependence treatment.  And

22   they hold it out there as a way for patients to receive

23   appropriate opioid-dependence treatment.  And then when people

24   call the Here to Help program to receive this referral for

25   opioid-dependence treatment, the company refers them to the
```

 1    same doctors that have been identified as issuing clinically

 2    unwarranted opioid prescriptions, having 800 patients, and

 3    Vegas-style cash machines.

 4            That referral -- this is the first of several

 5    arguments I'm going to make.  That referral is a fraudulent

 6    representation.  And there's no basis to hold as a matter of

 7    law that that's not fraudulent.  The jury, it's their province

 8    to determine whether it's fraudulent to knowingly send a

 9    patient to a doctor you've determined is issuing clinically

10    unwarranted opioid prescriptions to get money, which is the

11    reason they were making the referrals.

12            THE COURT:  So they were defrauding patients.

13            MR. MAYER:  Sorry.  No, Your Honor.  It's a fraud on

14    the payers.

15            THE COURT:  I'm sorry?

16            MR. MAYER:  That's a fraud on the people who pay for

17    the prescriptions.  Because those folks --

18            THE COURT:  So they're defrauding the health care

19    benefit programs by referring patients to doctors that are

20    going to do what?

21            MR. MAYER:  That they have determined issued

22    clinically unwarranted opioid prescriptions.

23            I guess one sort of hypothetical, it's not a perfect

24    analogy, but may be helpful to understand all this.  If we all

25    went down to the hospital right now and there is someone

```
 1   outside the exit, and we say, if you need appropriate pain
 2   treatment, I can refer you to someone.  Go to Dr. Smith for
 3   your pain treatment and that person knows that Dr. Smith is
 4   issuing clinically unwarranted opioid prescriptions and that
 5   person is making money off the prescriptions, it can be
 6   fraudulent on the part of the fraud scheme.
 7           THE COURT:  So the government's theory is the
 8   defendants had these doctors who were overprescribing, they
 9   believed, opioid medications.
10           MR. MAYER:  Right.
11           THE COURT:  And they wanted to boost those doctors
12   even more so they would buy more Suboxone Film; right?
13           MR. MAYER:  Yes, Your Honor.
14           THE COURT:  And so, in turn, that would defraud the
15   health care provider -- health care benefit programs.  Right?
16           MR. MAYER:  Yes.
17           Sorry.
18           THE COURT:  Because the theory is that Indivior knew
19   that these doctors were overprescribing and would submit
20   unwarranted billings to health care providers?  I mean, health
21   care benefit programs?
22           MR. MAYER:  We couldn't say that they knew that
23   would happen, we're saying that was a scheme.  It was part of
24   the fraud scheme for that to happen.
25           Of course, the statute talks about trying to obtain
```

```
 1    money from health care benefit programs by means of false or
 2    fraudulent representations.
 3             THE COURT:  Explain to me again how this works.
 4    What is the -- what is the government -- what are you going to
 5    tell the jury about this aspect of the case?
 6             MR. MAYER:  Sure.
 7             THE COURT:  So our proof is that Indivior knew that
 8    these doctors were overprescribing.  And so they had these
 9    things that they did to get these doctors to overprescribe
10    even more and that defrauded health care benefit programs.
11             MR. MAYER:  Yes.  The things they --
12             THE COURT:  That's what -- this is a health care
13    fraud statute.
14             MR. MAYER:  That's correct, Your Honor.
15             The victims, just to counter something the
16    defendants have said, the victims are the health care benefit
17    programs.  That's the victim of health care fraud.  And that's
18    the only victim that we're talking about.
19             THE COURT:  Right.
20             MR. MAYER:  So yes, if the -- well, not if.  The
21    company did determine that particular doctors were issuing
22    clinically unwarranted opioid prescriptions based on
23    information that the company received.  And then the company
24    told patients, hey, if you need opioid-dependence treatment,
25    come to us, we'll hook you up with a doctor.  Then when the
```

 1    patients came to them, they hooked them up with these doctors

 2    they identified as issuing clinically unwarranted opioid

 3    prescriptions, or switch to those doctors to get money from

 4    health care programs.

 5            And the other representation they make, "aid," which

 6    was discussed with the defense, we mean aid in the sense of

 7    helping.  They were also providing those same doctors with

 8    information about how to treat more patients, get insurance

 9    claims.

10            THE COURT:  Well, shouldn't you have added Section 2

11    to the charges just reflectively?  Because just helping is not

12    the legal definition of aiding and abetting.

13            MR. MAYER:  We included the language --

14            THE COURT:  They don't have the same intent and so

15    on.

16            MR. MAYER:  That's correct.  We did use the

17    statutory language, the aid, abet, counsel, command, induce,

18    and procure language to mean all the ways that somebody can be

19    understood to aid another.  We didn't mean it in the technical

20    legal sense in that paragraph that was under discussion

21    earlier.  We meant they were helping the doctors to get more

22    patients, and they were doing it to get those doctors to

23    switch to film.  And we think those representations that were

24    made to the doctors, the statements and the aid, and most of

25    all those referrals to the patients, those are fraudulent.

```
 1      Those are means of a fraudulent scheme.
 2             THE COURT:  Okay.  You mean that the -- what about
 3      this stuff about dinners and freebies and things like that?
 4             MR. MAYER:  Sure.  All part of the aid that the
 5      company was providing to the doctors.  And it all -- in the
 6      interest, it's sort of telling the full story of what happened
 7      with these doctors.  The company had the information about the
 8      doctors but for years -- they had, you know, the indictment
 9      says 2009, that's about the earliest we see they have this
10      information.  And sometime thereafter, I believe early 2010,
11      according to the e-mails, says clinically unwarranted
12      prescriptions by these doctors.  They're identified at that
13      time.  Then for years the company continues, and the evidence
14      will show this, the company continues to have people go out
15      and treat them to dinner, lunch to talk about how to get
16      insurance claims paid.  And as I've said, most of all
17      continues to refer patients their way having determined that
18      the doctors are issuing clinically unwarranted opioid
19      prescriptions.  And I don't think there should be a holding
20      that that's not fraud, that's not a fraudulent act.
21             I heard the defendants' argument that to the
22      defendants it doesn't sound in fraud to them.  It fits the
23      statute.  So there's no basis to say, to hold just as a matter
24      of law it's not fraud to refer somebody to clinically
25      unwarranted opioid prescriptions -- strike that.  To a doctor
```

1   issuing clinically unwarranted prescriptions to make money on

2   the prescriptions the doctor writes.  Just hold as a matter of

3   law that's not fraudulent.  We would think that's the jury's

4   province to determine whether or not that's fraudulent.

5        And one of the cases we cited, which was the closest

6   on point for this idea is with the *Swain* case from the Western

7   District of North Carolina.  The defendant argued hey, the

8   government found some images on my computer, but they're not

9   pornography.  The Court's response in that was it's for the

10  jury to decide whether or not that's pornography.  We think

11  the same principle applies to this.  It will be for the jury

12  to determine whether those referrals are fraudulent based on

13  what the company knew at the time and where they're going to

14  go to dinners and lunches and all the rest to doctors they

15  made that determination about in order to get money by

16  switching the doctors to film.

17       THE COURT:  And what is the fraudulent

18  representation exactly?

19       MR. MAYER:  Well, the easiest one to point out is

20  the referral.  The statement to the patient that we, you know,

21  we refer you to a doctor for your opioid-dependence treatment

22  knowing that doctor is actually one identified as writing

23  clinically unwarranted opioid prescriptions is a fraudulent

24  representation.  That's the best example.

25       And the other pretenses and representations in the

```
 1   meetings with doctors to aid them --
 2           THE COURT:  You mean implicit is, "This is a good
 3   doctor for you to go to" is fraud because they knew it wasn't
 4   a good doctor for the patient to go to?
 5           MR. MAYER:  Exactly.  Yes, Your Honor.
 6           And the jury could find that's not fraudulent.  But
 7   it could be.  It could be part of a fraudulent scheme.
 8   There's no legal reason it can't be.
 9           So that's the main issue that was argued by the
10   defendants.
11           And I'd like to touch on four other points, and I'll
12   do them more quickly.  The first is duplicity.  This idea that
13   the scheme which had one person -- or one actor running the
14   whole thing, Indivior, that all occurred during the same time
15   period; the marketing of Suboxone Film.  They point out that
16   the Here to Help program started before the market.  That's
17   because they were rolling it out in advance of the market so
18   they could get the program started and have it up and running
19   when the film reached the market.  But it's the same time
20   frame of the marketing of the film; for the same purpose, to
21   switch doctors to the film; same offenses, health care wire
22   fraud; and the same nature, it's all pharmaceutical marketing
23   practices.  The idea that's two different offenses that need
24   to be charged separately is not supported by the case law.
25   The case law was about -- for instance, one of the cases that
```

1    was pointed out in the briefing was the *Witasik* case from the

2    Western District of Virginia.  That's where a single person

3    was charged with some insurance frauds against multiple

4    insurance companies at one timeframe and then tax fraud at a

5    different time.  Those are different offenses.  So that was

6    found to be -- have a duplicity issue.  But these are the same

7    offense, same person, same time frame.  And the cases don't

8    say that's a duplicity problem.  And there's really no risk of

9    confusion, ultimately, at the end of the day, questions that

10   the jury could be confused about the scheme, and there's no

11   reason to think they would be.

12          Third, I'll say briefly.  Even if the Court were to

13   reject the idea that it could be -- that there were -- the

14   jury can find fraudulent representation in the referrals and

15   the aid, it's still not surplusage because that, those

16   activities are evidence of the company's intent and what it

17   was trying to do in referring patients and aiding these bad

18   doctors.  They were trying to increase film prescriptions and

19   they were doing it any way they could.  And they were trying

20   to make money from the health care benefit program through

21   film.  So it shows their intent.  It's real convincing on

22   intent because of how dangerous it is to send somebody who

23   comes for opioid-dependence treatment to a doctor who's

24   writing clinically unwarranted prescriptions.

25          Fourth is waiver.  We spent five months on the first

1   motion -- I shouldn't say we spent five months.  The

2   defendants had five months on their first motion to dismiss.

3   The date of the original indictment was April 9th, and they

4   had, pursuant to the scheduling order, until December 10th.

5   That's a five-month period.  There were 75 pages of briefing,

6   80 minutes of oral argument, and the Court issued a 21-page

7   decision.

8        And that was a long time ago now.  Here we are a

9   couple months from trial and we're doing it again.  And we're

10  talk about things that were perfectly available for the

11  defendant to argue back last summer over the course of five

12  months.  That has jammed up the scheduling of the case a bit.

13  There was a lot else due and there's been a lot of other

14  briefing in the last couple months, and there was no need to

15  relitigate this.  It could have been litigated back five

16  months ago.

17       Just looking at the criminal rules, I understand and

18  agree with defense counsel's observations, they're not meant

19  to be so rigid that a person can't supplement something based

20  on new evidence or new argument.  But there's no new evidence

21  or argument here.  And the rules say, the Rule 12(c)(1) says

22  there can be a scheduling order and the other says scheduling

23  order can be changed for good cause.  There's no good cause in

24  this instance.  These arguments were available last summer.

25  There were five months.  The superseding indictment didn't

```
1    change that.

2            THE COURT:  Well, what does the scheduling order

3    say?

4            MR. MAYER:  The scheduling order says that a motion

5    challenging the sufficiency of the indictment is due no later

6    than September 10th, 2019.  And that was five months after the

7    indictment.

8            And there was a superseding indictment in between,

9    but it just changed the ten words of paragraph 143.  So these

10   arguments weren't affected.  So there was this full and fair

11   opportunity last summer to have a hearing on all this.  And it

12   was all well-heard.  It was a big 75-page briefing, 80-minute

13   oral argument kind of deal.

14           THE COURT:  Well, your argument is based on the

15   scheduling order?

16           MR. MAYER:  That's correct, Your Honor.

17           THE COURT:  I mean, it's not just some general idea

18   of waiver.  Without the scheduling order -- well, the

19   scheduling order is the basis of your motion, or your defense

20   or argument?

21           MR. MAYER:  100 percent.

22           That's correct.  We rely on the *Mathis* case, which

23   distinguishes in the sense that someone waited all the way

24   until trial.  The reason we rely on it, the Fourth Circuit

25   said, if you break the schedule, you need to have good cause.
```

```
 1    And here there was a scheduling order in place, it was
 2    followed, then they broke it.  And there's no cause.  No cause
 3    has been shown.  We don't even know what the cause is supposed
 4    to have been for why this was filed so late.  They say it was
 5    a superseding indictment.  The superseding indictment doesn't
 6    change any of the issues we're arguing about today, so that's
 7    not cause.
 8              Finally, briefly, the grand jury issue.  They've
 9    argued again, they've cited a number of cases where
10    prosecutors told the grand jury there was a time limit to
11    return an indictment.  There's -- that didn't happen.  There's
12    no evidence that happened here.  So it's just totally
13    inaccurate to raise that.  Those cases don't apply and there's
14    no basis to reopen that issue.
15              One last point.  There's been a lot of talk about,
16    well, in referring patients to doctors that we determined were
17    issuing clinically unwarranted prescriptions.  Well, we have
18    to know what the DEA thought about it and we need to know what
19    SAMSHA and these other agencies thought about it.  We're not
20    alleging they referred patients to doctors that they thought
21    the DEA had made a determination about or not, or they thought
22    that SAMSHA made a determination, that's not what the
23    indictment is.  The indictment is very specific.  They were
24    referring patients to doctors they had determined were issuing
25    clinically unwarranted prescriptions because they wanted the
```

```
 1    money from switching those doctors to film.  And so all the

 2    talk about what folks in government may or may not have

 3    thought or known, the company didn't know, it's outside the

 4    scope of what's indicted.

 5            THE COURT:  It may be apparent, but what do you mean

 6    by switching them to film?  I mean, I understand that film is

 7    the issue here, but "doctors who are overprescribing opioids,

 8    switching them to film," what is the -- where is the switching

 9    to film related to fraud?

10            MR. MAYER:  Yes, Your Honor.  So the situation the

11    company was in, as reflected in the e-mails, the

12    communications of its executives, is that they had a tablet,

13    Suboxone Tablet, that they were anticipating generic

14    competition and that that business line was going to disappear

15    pretty rapidly once generics came in.  So they developed

16    Suboxone Film, what they called it:  A switch campaign, a

17    switch blitz.  Their business goal was to get doctors to

18    switch to prescribe Suboxone Film instead of tablets.  That

19    was the business goal that the company had because that was

20    the only way they were going to make money in the future.

21    They had determined their future profit was going to be based

22    on the film.  There wasn't going to be much in the tablet.

23            THE COURT:  Right.

24            MR. MAYER:  So the aspects that -- the aspects were

25    designed to switch doctors over to the film so they could get
```

1    money for the film prescriptions in the future.

2           And it wasn't -- it wasn't just telling doctors that

3    the film is safer, it was telling doctors, you're going to end

4    up on the witness stand defending your prescription due to the

5    death of a child.  It was telling doctors, you're going to

6    cause baby deaths; telling them that film weeds out drug

7    seekers and protects the community.

8           I mean, these are -- it's been sort of summarized by

9    the defendants, oh, they said it was safer.  That's not the

10   evidence.  The evidence was these specific things were said.

11   And when they gave the doctors graphs, they took lines out of

12   the graphs so the doctors couldn't see all the data.  That's

13   what the graphs were all about.  And when they sent data from

14   Medicaid to them, they just falsified it.  They just changed

15   the numbers.  So it's not just, oh, I don't think they're

16   safer, maybe there's data about that.  That's not what the

17   allegation is.

18           THE COURT:  Right.  But these doctors who were

19   overprescribing opioids switching to film, that's the

20   connection I don't understand.

21           MR. MAYER:  Sure.  They had a -- there was a

22   meeting -- sorry.

23           THE COURT:  In other words, were those doctors --

24   they thought that they would be a better market for film

25   because why?

1          MR. MAYER:  No.  It was because those doctors were

2    really important to the bottom line because they issued lots

3    and lots of prescriptions, and they had data analysis showing

4    what a big impact these high-prescription doctors had on

5    revenue.  And so it was a big priority to get these

6    high-prescribing doctors to switch over to the film.  If they

7    didn't, it would be a lot of lost money.

8          THE COURT:  High prescribing of what, the tablet?

9          MR. MAYER:  Correct.  Yes.  These were doctors who

10   were high prescribers of tablets; buprenorphine tablets, so

11   Subutex and Suboxone.  They wanted to get those prescribers

12   switched so that they were doing high prescribing of the film.

13   In that same time, they identified those high-dose prescribers

14   were writing to 800 people at a time in the case of Dr. A.

15   But they really wanted to switch them to the film so they

16   could get the money on film prescriptions going forward with

17   Dr. A.

18          THE COURT:  And the allegation is that they knew

19   these doctors were -- shouldn't have been prescribing so much?

20          MR. MAYER:  Correct.  That the doctors shouldn't

21   have been prescribing so much, shouldn't have been prescribing

22   such high doses, and other things that are more anecdotal,

23   like the Vegas-style cash machine with Dr. C.  Dr. B had lost

24   the license to prescribe in Kentucky and they continued

25   referring patients to these folks.  They did it because they

```
 1    wanted to get those folks to switch onto film.  That was the
 2    future profit source for the company.  They wanted to be in
 3    the good graces of those doctors so those doctors would switch
 4    to the film.
 5              THE COURT:  Okay.  Let me hear from the other side.
 6              MR. MAYER:  Thank you, Your Honor.
 7              MR. LOONAM:  Sorry, Your Honor, I just wanted to get
 8    down the last bit that Mr. Mayer stated to Your Honor, which I
 9    think is probably, you know, as far as what the allegations
10    are, sums up the allegations that, "They wanted to be in the
11    good graces of the doctors so they would switch over to film."
12    That's not fraud.  There's no dishonesty.  They weren't duped.
13    There's no allegation in the indictment that the doctors
14    submitted medically unnecessary prescriptions.  That would be
15    a normal health care fraud case.  That's not alleged here.
16              The government --
17              THE COURT:  Well, I thought in response to my
18    questions the theory was that they were referring patients,
19    that the fraud was telling patients you ought to go to see
20    this doctor.
21              MR. LOONAM:  So let's --
22              THE COURT:  And their intent was because these
23    doctors were high prescribers that they would make more money
24    from the health care benefit programs that paid for these
25    prescriptions.
```

1          MR. LOONAM:  So let's -- this motion is on the face

2    of the indictment.  And let's look at the face of the

3    indictment as to what it says about these referrals and the

4    Here to Help program.

5          No allegation that doctors that switched over to

6    film were prioritized in the Here to Help program.  To go

7    outside the indictment, you know why?  Because it didn't

8    happen.  No allegation that doctors who were high prescribers

9    that are the focus of this were promoted in these Here to Help

10   referrals, that they were given priority over other doctors as

11   a result of their high prescribing.  It's not alleged to go

12   outside the indictment.  You know why?  Because it didn't

13   happen.

14         This Here to Help program was based on geographic

15   proximity.  And we don't need to go outside the indictment,

16   because that's what's alleged.  Solely geographic proximity.

17   Someone calls, I need a Data-2000-waived doctor, here is my

18   zip code.  Here are the doctors, in a menu that comes up

19   there, closest to you.

20         No link in this indictment between those referrals

21   and any dishonesty, any misstatement.  It's just nonexistent

22   in the indictment.  So to the extent that the government now

23   gets up and says, well, those referrals were dishonest

24   because...  That is not contained in the indictment.  And it's

25   also inconsistent with what they affirmatively say, which is

1    that they were based on geographic proximity.

2            So they're juxtaposing knowledge of what the company

3    or what somebody at the company said, "clinically unwarranted

4    prescriptions."  Right?  They're saying they continued to

5    refer patients to them based on geographic proximity.  That's

6    not fraud.  There's no misleading going on there.  They don't

7    tie that referral to any claim that there was a medically

8    unnecessary script written.  It doesn't happen.

9            And, so, then they still haven't articulated a

10   theory of fraud.  And that -- and according to the government,

11   the referrals, that's the best they got to keep digging.  And

12   if it doesn't fit -- the government said, well, there's no

13   basis to say that that's not fraud.  I beg your pardon.  You

14   need a scheme to defraud.  A means for fraud involves

15   dishonesty.  The jury instructions are you have to find a

16   material misstatement, a material omission, or dishonesty to

17   obtain money or property.

18           And what this is is it looks like the government

19   going back to, you know, when we were last before Your Honor

20   in the context of where this investigation started and the

21   search warrant affidavit.  This case started as an

22   investigation of Title 21 into a more typical health care

23   pill-mill case that they weren't able to make.  They got

24   halfway there.  And they've just decided to append those

25   allegations because they have some evidence of it into this

1   and shoehorned it, tried to shoehorn it into fraud.  But it's

2   not fraud.  If the government had a Title 21 case, it would

3   have made it.  It didn't.  And they can't prejudice Indivior

4   by trying to associate us with pill mill -- alleged pill-mill

5   doctors when it hasn't made the allegations that would allow

6   them to do that.

7           So to the extent it says it's still evidence of

8   intent, you've heard my argument on that.  It's not pled as

9   evidence.  It's pled as a means to commit fraud.  So it can't

10  survive in the indictment in this form.  And to the extent the

11  government wants to bring evidence, the time for 404(b) notice

12  under the scheduling order has passed.  That being said, given

13  the developments here, the government should promptly file

14  notice of 404(b), its intention to introduce evidence under

15  404(b) of the activities with respect to these doctors, and

16  then we could have this discussion in the context it belongs,

17  which is an evidentiary discussion about its probative value

18  of the fraud that's alleged with respect to A through C versus

19  its prejudice and the side show that it is going to cause

20  during this trial.

21          And to the extent that the government says, well,

22  SAMSHA and DEA are irrelevant, they are not, Your Honor,

23  because they have alleged, not only the fact that Indivior

24  believed that the doctors' prescriptions practices were

25  clinically unwarranted, it alleges that, in fact, those

```
 1   practices -- the doctors were prescribing in a clinically
 2   unwarranted manner.  Right?  So it's different.  It's not just
 3   knowledge.  They're saying as a matter of fact the doctors
 4   were prescribing.  To the extent the DEA is in there, they
 5   have relevant evidence as to what the prescription practices
 6   were.
 7          They did a DATA 2000 inspection of every doctor who
 8   has waived.  So that's going to be irrelevant.
 9          And look, to the extent the government has all this
10   great evidence that these doctors are so bad, prescribing in a
11   clinically unwarranted manner, you know, they have Vegas-style
12   cash machines that they love to bring up as prejudice, those
13   doctors are still on a government list, the SAMSHA list, that
14   did the same exact thing, that refers people to -- based on
15   geographic proximity to a DATA-waived doctor.  You can do that
16   today regarding those same doctors.  So they're letting the
17   dog walk them.
18          THE COURT:  Well, as you say, we have to look at the
19   face of the indictment for your arguments.
20          MR. LOONAM:  Undoubtedly, Your Honor.
21          THE COURT:  We've gotten into the evidence.  I
22   understand that.  It's helpful for me to understand a little
23   bit about the theories.  But, anyway.
24          MR. LOONAM:  Your Honor, look, it was responding to
25   the government's arguments.  But, I agree, you have to look at
```

1    the four corners of the indictment.  And if you look at the

2    four corners of the indictment, what's said about those

3    referrals is that they were based on geographic proximity, not

4    that they were done to promote doctors who were high

5    prescribers in order for them to submit medically unnecessary

6    claims to defraud the health care benefit provider.  That

7    is -- that's not the allegation.  That does not -- that is not

8    in here.

9            So, to the extent it was done to get in the good

10   graces of the doctor to get them to switch to film, that's not

11   fraud.  You take somebody to dinner to get in their good

12   graces, not fraud.  You allow somebody to continue to

13   participate in a program that's available -- this, by the way,

14   the Here to Help referral program, it's not -- every doctor

15   that wanted to opt into it could get into it who was DATA

16   waived.  So it's not as if these referrals -- it's not as if

17   these referrals were specific to doctors that were

18   overprescribing.  Right?  These are doctors who DATA waived,

19   who opted in, who were close in proximity as a matter of just

20   where they were located to the people that called in.  And

21   that's what's alleged.  And that does not sound in fraud

22   because it's not dishonest, it's not a misrepresentation.  The

23   idea of a referral being inherently dishonest or a

24   misrepresentation, that's simply not alleged in here.

25            So, one moment, Your Honor.

```
1                  Sorry, I just wanted to check my notes.

2                  Thank you, Your Honor.

3             THE COURT:  Thank you.

4                  Well, thank you, counsel.  I'm going to take the

5    motion under advisement.

6                  Is there anything else we need to talk about in

7    relation to this case?

8                  We're going fast toward trial and everything's

9    groovy.

10            MR. MAYER:  Only one, briefly, Your Honor.  We are

11   working -- we proposed to the defendants a stipulation that a

12   number of its own e-mails that it produced in response to

13   doctors would be admissible.  And we asked for a response and

14   it hasn't -- that time hasn't passed yet.  But if we're not

15   able to work that out, we anticipate making a motion in limine

16   to find certain e-mails of the company that were produced in

17   response to doctors by the company are admissible.  So that's

18   something that may be around the bend, but hopefully we can

19   work it out between the parties.

20            THE COURT:  We have a pretrial conference set in

21   this case, as I recall, and I believe in the scheduling order

22   there are time limits for filing motions in limine prior to

23   the pretrial conference.

24            MR. MAYER:  That's correct, Your Honor.

25            THE COURT:  Okay.  Well, thank you, counsel.
```

```
 1              I'm not going to come down and shake your hands,
 2    just to make sure we don't spread any viruses.  And you people
 3    that come from distant places, we're not so sure about that.
 4              MR. LOONAM:  Totally understandable, Your Honor.
 5              THE COURT:  But it's nice to see you all, and we'll
 6    recess court.
 7         (Proceedings concluded at 2:35 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1   **REPORTER'S CERTIFICATE**

2

3          I, DONNA J. PRATHER, do hereby certify that the

4   above and foregoing, consisting of the preceding 43 pages,

5   constitutes a true and accurate transcript of my stenographic

6   notes and is a full, true and complete transcript of the

7   proceedings to the best of my ability.

8          Dated this 28th day of February, 2020.

9

10          DONNA J. PRATHER, RPR, CRR, CBC, CCP

11          Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25